*NOT FOR PUBLICATION*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ——————————————— | : | |
| UNITED STATES of America, | : | |
| | : | Crim. Action No. 17-316 (FLW) |
| v. | : | |
| | : | **OPINION** |
| Ishmael ABDULLAH, | : | |
| | : | |
| Defendant. | : | |
| ——————————————— | : | |

**WOLFSON, United States District Judge:**

After Defendant Ishmael Abdullah ("Defendant") pled guilty to a controlled substance offense and being a felon in possession of a firearm, this Court held a sentencing hearing, where I ultimately sentenced Defendant to a term of imprisonment of 176 months on the controlled substance charge, and 120 months on the firearm charge, to run concurrently, followed by a term of supervised released. As part of Defendant's sentence, I found that Defendant was subject to sentencing enhancements for, *inter alia*, being: (1) a career offender, as defined under § 4B1.1(a) of the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."); and (2) an "organizer or leader" of criminal activity, as defined under U.S.S.G. § 3B1.1(a). During the course of the sentencing hearing, however, I reserved the right to supplement my oral ruling by written opinion. The present opinion serves as a supplement the Court's findings as to the applicability of the career offender and "organizer or leader" enhancements to Defendant's sentence.

## I.      BACKGROUND

On August 16, 2017, Defendant pled guilty to a two-count Information charging him with: (1) conspiracy to distribute, and possession with intent to distribute, 100 grams or more of

a mixture or substance containing a detectible amount of heroin, contrary to 21 U.S.C. § 846; and (2) unlawful possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1).

A presentence investigation report ("PSR") recommended, among other things, that Defendant be sentenced pursuant to the career offender enhancement in the Guidelines. That enhancement applies to a defendant if, *inter alia*, "the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a). The PSR's recommendation was based upon two prior offenses in Defendant's criminal history: (1) a 2010 conviction for the manufacture or distribution, or intent to manufacture or distribute, a controlled dangerous substance; and (2) a 2015 conviction for aggravated assault with a deadly weapon, in violation of N.J.S.A. § 2C:12-1(b)(2). PSR ¶¶ 169, 171. The PSR also recommended that Defendant receive a four-level sentencing enhancement, pursuant to § 3B1.1(a) of the Guidelines, for being an "organizer or leader" of criminal activity involving five or more participants. *Id.* at ¶¶ 139, 154.

On December 18, 2017, the United States (the "Government") submitted a brief outlining its position as to the sentence to be imposed on Defendant. Defendant submitted a sentencing memorandum in opposition on December 27, 2017.[1] Defendant concedes that the 2010 controlled substance offense qualifies as a predicate offense for the purposes of the career offender enhancement. Thus, the parties' arguments at sentencing focused on whether Defendant's 2015 conviction for aggravated assault with a deadly weapon was a "crime of violence" under U.S.S.G. § 4B1.2, – and thus, whether it qualified as a predicate offense for the purposes of the career offender sentencing enhancement – and whether Defendant was subject to

---

[1] The Government filed its reply on January 2, 2018.

the four-level enhancement under U.S.S.G. § 3B1.1(a) for being an "organizer or leader" of criminal activity.

At sentencing, I determined that Defendant qualified for both the career offender and "organizer or leader" sentencing enhancements, and imposed a slightly below Guidelines sentence. During the sentencing hearing, however, I indicated to the parties my intention to issue a supplemental decision with respect to my findings regarding the applicability of the career offender and "organizer or leader" sentencing enhancements, which findings follow.

## II.  LEGAL STANDARD

This Court has jurisdiction pursuant to 18 U.S.C. § 3231. *See United States v. Chapman*, 866 F.3d 129, 131 (3d Cir. 2017). "In sentencing a defendant, district courts follow a three-step process: At step one, the court calculates the applicable Guidelines range, which includes the application of any sentencing enhancements." *United States v. Wright,* 642 F.3d 148, 152 (3d Cir. 2011). "At step two, the court considers any motions for departure and, if granted, states how the departure affects the Guidelines calculation." *Id.* "At step three, the court considers the recommended Guidelines range together with the statutory factors listed in 18 U.S.C. § 3553(a) and determines the appropriate sentence, which may vary upward or downward from the range suggested by the Guidelines." *Id.*  In calculating the Guidelines sentence, the Third Circuit has "explained that, '[a]s before [*United States v. Booker*, 543 U.S. 220 (2005)], the standard of proof under the guidelines for sentencing facts continues to be preponderance of the evidence.'" *United States v. Ali*, 508 F.3d 136, 143 (3d Cir. 2007) (citation omitted).  The present dispute concerns the applicable Guidelines range at step one, and thus, the Government bears the burden of demonstrating, by a preponderance of the evidence, that the career offender and "organizer or leader" sentencing enhancements are applicable in this case.

**III.**  **DISCUSSION**

**A.**  **Career Offender Sentencing Enhancement**

Under the Guidelines, a defendant is a career offender if:

(1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

U.S.S.G. § 4B1.1(a).  Here, the parties concede that Defendant satisfies the first two criterion of

the career offender enhancement statute, and that Defendant's 2010 drug-trafficking conviction

constitutes a prior felony conviction for a controlled substance offense.  The dispute thus centers

on whether Defendant's 2015 conviction for aggravated assault with a deadly weapon under

N.J.S.A. § 2C:12-1(b)(2) constitutes a "crime of violence" under the Guidelines.  If the Court

answers that question affirmatively, Defendant is a career offender under U.S.S.G. § 4B1.1(a).

The Guidelines[2] define a "crime of violence," in relevant part, as:

(a) . . . any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that—

(1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or

---

[2] In *Peugh v. United States*, 569 U.S. 530 (2013), the Supreme Court held that "there is an *ex post facto* violation when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense." *Id.* at 533.  Here, Defendant argues, and the Government concedes, that, for the purposes of Defendant's sentence, the Court should apply the definition of "crime of violence" used in the 2015 version of the Guidelines, rather than the 2016 Guidelines, because the criminal activity at issue in this case occurred in 2015, and the 2015 Guidelines did not list "aggravated assault" as an enumerated offense under U.S.S.G. § 4B1.2(a)(2), while 2016 version includes "aggravated assault" within U.S.S.G. § 4B1.2(a)(2).  Accordingly, because sentencing Defendant under the 2016 Guidelines would "create[] a 'significant risk' of a higher sentence" for Defendant, the Court applies the definition of "crime of violence" contained in the 2015 Guidelines. *Id.* at 530.

(2) is burglary of a dwelling, arson, or extortion, involves the use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

U.S.S.G. § 4B1.2.  Here, the Government relies solely on the "Elements Clause" of that Guideline, U.S.S.G. § 4B1.2(a)(1), arguing that N.J.S.A. § 2C:12-1(b)(2) is a crime of violence, as defined by U.S.S.G. § 4B1.2(a)(1), because the "use, attempted use, or threatened use of physical force against the person of another" is an element of the state offense.[3]  "Physical force" under § 4B1.2(a)(1) "means 'violent force,' which is a 'force capable of causing physical pain or injury to another person.'"  *United States v. Lewis*, No. 16-4378, 2018 WL 317776, at *2 (3d Cir. Jan. 8, 2018) (quoting *Johnson v. United States*, 559 U.S. 133, 139 (2010)).[4]  For the offense to constitute a crime of violence, the Third Circuit also requires that the use of physical force be knowing or intentional, as opposed to reckless or negligent.  *United States v. Otero*, 502 F.3d 331, 335 (3d Cir. 2007).

Sentencing courts typically employ the "categorical approach" to determine whether a particular offense constitutes a "crime of violence" under § 4B1.2(a)(1).  *United States v. Brown*, 765 F.3d 185, 189 (3d Cir. 2014).  Under the categorical approach, the sentencing court must

---

[3] To that end, the Government does not argue that N.J.S.A. § 2C:12-1(b)(2) is a crime of violence under U.S.S.G. § 4B1.2(a)(2), the "Enumerated Offense Clause."

[4] Although *Johnson* involved a sentencing enhancement under the "violent felony" provision of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), as opposed to the concept of a "crime of violence" under the Guidelines, the Third Circuit has interpreted those two concepts analogously.  *See Lewis*, 2018 WL 317776 at *2 n. 6 ("Although *Johnson* involved a sentencing enhancement under the ACCA, our Court has extended that analysis to § 4B1.2."); *Chapman*, 866 F.3d at 133 (finding that the Supreme Court's analysis of a "violent felony" under the ACCA was binding on the court's analysis of a "crime of violence" under the Guidelines); *United States v. Hopkins*, 577 F.3d 507, 511 (3d Cir. 2009) ("While the Court was not called upon to construe the career offender provision of the Sentencing Guidelines, the definition of a violent felony under the ACCA is sufficiently similar to the definition of a crime of violence under the Sentencing Guidelines that authority interpreting one is generally applied to the other, as demonstrated by the Supreme Court's remand order in this case.").

"compare the elements of the statute forming the basis of the defendant's conviction with the elements of the 'generic' crime—*i.e.*, the offense as commonly understood." *Descamps v. United States*, 570 U.S. 254, 133 S. Ct. 2276, 2281 (2013). The categorical approach thus requires the court to "'look only to the statutory definitions' – *i.e.*, the elements – of a defendant's prior offenses, and *not* 'to the particular facts underlying those convictions.'" *Id.* at 2283 (quoting *Taylor v. United States*, 495 U.S. 575, 600 (1990)). "The prior conviction qualifies as . . . [a] predicate only if the statute's elements are the same as, or narrower than, those of the generic offense." *Id.* at 2281.

In the context of determining whether an offense qualifies as a "crime of violence," as defined under § 4B1.2(a)(1), the Elements Clause, "a court simply asks 'whether the state crime has the use or threat of physical force [against the person of another] as an element of the offense.'" *Brown*, 765 F.3d at 189 (quoting *United States v. Remoi*, 404 F.3d 789, 794 (3d Cir. 2005)). "If the statute has this element, or 'defines the crime more narrowly,' then the conviction can serve as a predicate offense." *Chapman*, 866 F.3d at 134 (quoting *Descamps*, 133 S. Ct. at 2283). Conversely, if the state statute "'sweeps more broadly' than the federal definition, a conviction under it is not a career offender predicate even if the defendant actually committed the offense in a way that involved the use (or threatened use) of physical force against another." *Brown*, 765 F.3d at 189.

However, in cases where the defendant is convicted under a statute that is "divisible" – *i.e.*, under a statute that "comprises multiple, alternative versions of the crime,"– courts apply the "modified categorical approach." *Descamps*, 133 S. Ct. at 2283-84. Under the modified categorical approach, the sentencing court "can look beyond the fact of conviction and examine certain record evidence from the conviction to determine whether the prior offense is a crime of

violence." *Brown*, 765 F.3d at 189.  In other words, in cases that implicate a divisible statute, the

modified categorical approach enables the sentencing court to take the additional step of looking

beyond the fact of conviction to determine which version of the statutory crime the defendant

was convicted under.  To wit, the *Descamps* Court explained the modified categorical approach

as follows:

> [T]he modified approach merely helps implement the categorical approach when a
> defendant was convicted of violating a divisible statute. The modified approach thus acts
> not as an exception, but instead as a tool. It retains the categorical approach's central
> feature: a focus on the elements, rather than the facts, of a crime. And it preserves the
> categorical approach's basic method: comparing those elements with the generic
> offense's. All the modified approach adds is a mechanism for making that comparison
> when a statute lists multiple, alternative elements, and so effectively creates several
> different . . . crimes. If at least one, but not all of those crimes matches the generic
> version, a court needs a way to find out which the defendant was convicted of. That is the
> job, as we have always understood it, of the modified approach: to identify, from among
> several alternatives, the crime of conviction so that the court can compare it to the generic
> offense.

*Descamps*, 133 S. Ct. at 2285 (internal citation and quotation marks omitted).

Here, the Court will apply the modified categorical approach, because the statute that

formed Defendant's aggravated assault conviction, N.J.S.A. § 2C:12-1(b), is divisible; *i.e.*, §

2C:12-1(b) contains "multiple versions" of the aggravated assault offense.[5]  Specifically, under §

2C:12-1(b), a person is guilty of aggravated assault if, *inter alia*, he or she:

---

[5] Defendant's argument that the Court should apply the categorical approach to N.J.S.A. §
2C:12-1(b)(2), because that statute "does not define multiple crimes by listing 'multiple
alternative elements,'" Def.'s Br. at 3, is misplaced.  To that end, the question for this Court is
not whether N.J.S.A. § 2C:12-1(b)(2) is a divisible statute, but whether New Jersey's omnibus
assault statute, N.J.S.A. § 2C:12-1, is a divisible statute.  Indeed, by focusing on the specific
subdivision of New Jersey's assault statute that formed Defendant's conviction, Defendant
concedes that the Court may apply the modified categorical approach to find that Defendant was
convicted of aggravated assault with a deadly weapon under N.J.S.A. § 2C:12-1(b)(2).  And, as
*Descamps* instructs, once the Court employs the modified categorical approach to find that
Defendant was convicted under § 2C:12-1(b)(2), the Court applies the same analysis as it would
under the categorical approach.

> (1) Attempts to cause serious bodily injury to another, or causes such injury purposely or knowingly or under circumstances manifesting extreme indifference to the value of human life recklessly causes such injury; or
>
> (2) Attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon; or
>
> (3) Recklessly causes bodily injury to another with a deadly weapon; or
>
> (4) Knowingly under circumstances manifesting extreme indifference to the value of human life points a firearm, as defined in subsection f. of N.J.S.2C:39-1, at or in the direction of another, whether or not the actor believes it to be loaded . . . .

N.J.S.A. § 2C:12-1(b)(1)-(4).  Looking beyond the fact of conviction in this case, the Court finds – and Defendant does not dispute – that Defendant was convicted of aggravated assault with a deadly weapon, in violation of N.J.S.A. § 2C:12-1(b)(2).

Having found that Defendant was convicted of aggravated assault with a deadly weapon, in violation of § 2C:12-1(b)(2), the Court must next apply the categorical approach to determine whether that subdivision, by its elements, is categorically a crime of violence, and thus, can serve as a predicate offense for the purposes of the career offender enhancement.  *See Brown*, 765 F.3d at 194.  Because the Government relies solely on the Elements Clause of the Guidelines, that inquiry requires this Court to determine whether N.J.S.A. § 2C:12-1(b)(2) has as one of its elements the "use, attempted use, or threatened use of physical force against the person of another."  U.S.S.G. § 4B1.2(a)(1).  The Government argues that because a conviction for aggravated assault with a deadly weapon under N.J.S.A. § 2C:12-1(b)(2) requires a person to "[a]ttempt[] to cause or purposely or knowingly cause[] bodily injury to another with a deadly weapon," and because causing bodily injury necessarily involves the use of "physical force," the statute categorically qualifies as a crime of violence under the Elements Clause.  In opposition, Defendant argues that § 2C:12-1(b)(2) is broader than the federal generic version of aggravated assault, and thus, that § 2C:12-1(b)(2) is not a crime of violence.

The elements of aggravated assault with a deadly weapon are: (1) "attempt[ing] to cause or purposely or knowingly caus[ing]"; (2) "bodily injury to another"; (3) "with a deadly weapon." N.J.S.A. § 2C:12-1(b)(2). Stated differently, aggravated assault under § 2C:12-1(b)(2) is committed by inflicting "bodily injury" to the person of another. The assault statute defines "bodily injury" as "physical pain, illness or any impairment of physical condition." N.J.S.A. § 2C:11-1(a). Thus, in analyzing whether Defendant's prior conviction for aggravated assault with a deadly weapon constitutes a crime of violence, the Court must therefore determine whether inflicting "bodily injury," as that term is defined in § 2C:12-1(b)(2), necessarily includes a use of "physical force," – *i.e.*, "force capable of causing physical pain or injury to another person," *Johnson*, 559 U.S. at 140 – and, if so, whether the infliction of bodily injury must be intentional or knowing. *See Otero*, 502 F.3d at 335.

In determining whether N.J.S.A. § 2C:12-1(b)(2)'s bodily injury element requires the use of physical force, as is required to constitute a crime of violence under the Elements Clause, the Court is guided by the Third Circuit's non-precedential decisions in *United States v. Gorny*, 655 F. App'x 920, 922 (3d Cir. 2016)[6] and *United States v. Lewis*, No. 16-4378, 2018 WL 317776 (3d Cir. Jan. 8, 2018). Following the defendant's conviction in *Gorny*, the district court found that the defendant had two prior convictions for "crimes of violence," as defined under U.S.S.G. § 4B1.2, and thus, applied a sentencing enhancement under U.S.S.G. § 2K2.1(a)(1).[7] *Id.* On appeal, the defendant argued that the district court erroneously found that his prior conviction for

---

[6] The Court notes that although the Government cited *Gorny* in its initial brief, Defendant failed to address the applicability of that case in his opposition.

[7] Similar to the career offender sentencing enhancement, U.S.S.G. § 2K2.1(a)(1) provides for a sentencing enhancement if, at the time of the instant offense, the defendant has "at least two felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 2K2.1(a)(1).

aggravated assault with a deadly weapon under 18 PA. C.S. § 2702(a)(4) constituted a "crime of violence." *Id.* at 924. Section 2702(a)(4) provides that a "person is guilty of aggravated assault if he . . . attempts to cause or intentionally or knowingly causes *bodily injury* to another with a deadly weapon." 18 PA. C.S. § 2702(a)(4) (emphasis added).

Applying the modified categorical approach, the Third Circuit held that § 2702(a)(4) was a crime of violence under the Elements Clause, "because it 'has as an element the use, attempted use, or threatened use of physical force against the person of another.'" *Gorny*, 655 F. App'x at 925 (quoting U.S.S.G. § 4B1.2(a)(1)). Specifically, in finding that § 2702(a)(4)'s bodily injury element required the use of physical force, the Third Circuit noted that in *United States v. Castleman*, 134 S.Ct. 1405 (2014), the Supreme Court "explained that 'the knowing or intentional causation of bodily injury necessarily involves the use of physical force.'" *Gorny*, 655 F. App'x at 925 (quoting *Castleman*, 134 S.Ct. at 1414).[8] Accordingly, the court found that because Pennsylvania's aggravated assault statute had as an element the causation of bodily injury, and because, under Supreme Court precedent, causing bodily injury necessarily requires

---

[8] Defendant argues that *Castleman* is not binding here, because *Castleman* defined "physical force" within the context of a "misdemeanor crime of domestic violence," *Castleman*, 134 S. Ct. at 1413, and this case involves "physical force" within the context of a felony "crime of violence," as defined under the Guidelines. However, Defendant's argument was rejected in both *Chapman* and *Lewis*, where the Third Circuit extended *Castleman's* analysis of physical force to felony crimes of violence, as defined under § 4B1.2(a) of the Guidelines. *See Chapman*, 866 F.3d at 133 (rejecting the defendant's argument that *Castleman* lacked persuasive value in analyzing whether bodily injury necessarily involves "physical force," as that term is used in the Elements Clause, finding that *Castleman's* analysis of physical force applied to § 4B1.2(a)); *Lewis*, 2018 WL 317776 at *3 n. 8 ("Although *Castleman* involved the application of the force clause in 18 U.S.C. § 921(a)(33)(A)(ii), our Court has explicitly extended *Castleman's* analysis of the use of physical force to the use of physical force clause under § 4B1.2(a)(1).").

the use of physical force, the defendant's conviction qualified as a crime of violence under the Elements Clause of the Guidelines.[9]  *See id.*

More recently, in *Lewis*, the Third Circuit again analyzed whether 18 PA. C.S. § 2702(a)(4) qualified as a crime of violence under the Elements Clause of the Guidelines.  *See Lewis*, 2018 WL 317776 at *4-5.  To answer that question, the court noted that it was tasked with determining "whether the elements of § 2702(a)(4) necessarily include a use of physical force under § 4B1.2(a)(1)'s force clause and proof of intent or knowledge."  *Id.* at *4.  First, the court found that the statute "explicitly requires intent or knowledge, thereby satisfying the force clause's required mental state."  *Id.*  Second, in finding that § 2702(a)(4) had as an element the use of physical force, the court explained:

> To determine whether the crime includes that sort of violent force, we must examine two terms in the statute: bodily injury and deadly weapon. Pennsylvania defines "[b]odily injury" to mean an "impairment of physical condition or substantial pain," and "[d]eadly weapon" to include "any . . . device or instrumentality which, in the manner in which it is used or intended to be used, is calculated or likely to produce death or serious bodily injury." 18 PA. CONS. STAT. § 2301. Aggravated assault under § 2702(a)(4) therefore requires intentional or knowing conduct sufficient to cause bodily "impairment" or "substantial pain" by means of a device that is "calculated or likely to produce death or serious injury." Because "it is impossible to cause bodily injury without applying force,"

---

[9] The *Gorny* court noted that "[w]hile *Castleman* reserved the question of whether 'bodily injury' is necessarily caused by 'violent force' as defined in *Johnson*, 559 U.S. at 140, we need not answer this question, for we conclude that it would not be plain error to determine that the causation of bodily injury necessarily requires the use of force capable of causing bodily injury—that is, 'violent force.'" *Gorny*, 655 F. App'x at 925.  And, while *Gorny* was decided on a plain error standard, and the present case involves a preponderance standard, the difference in standards of review does not strip *Gorny* of its persuasive force.  *See United States v. Bailey*, No. 4-24, 2017 WL 2720281, at *3 (W.D. Pa. June 23, 2017) (finding that, despite the fact that *Gorny* was decided on a plain error standard, it "remain[ed] both instructive and persuasive in this case.").  Indeed, several courts within this Circuit have relied on the *Gorny* court's finding that bodily injury under Pennsylvania's aggravated assault statute necessarily requires the use of physical force. *See, e.g.*, *Bailey*, 2017 WL 2720281 at *3 (applying *Gorny* to find that 18 PA. C.S. § 2702(a)(4) qualified as a crime of violence under U.S.S.G. § 4B1.2(a)(1), because the bodily injury requirement of that statute mandates the use of physical force); *United States v. Lewis*, No. 15-368, 2017 WL 368088, at *3 (E.D. Pa. Jan. 25, 2017), *aff'd sub nom. Lewis*, 2018 WL 317776 (same).

> *Castleman*, 134 S. Ct. at 1415, conduct causing bodily "impairment" or "substantial pain" necessarily involves a use of a force. Moreover, the force under § 2702(a)(4) necessarily includes physical force within the meaning of § 4B1.2(a)(1) because § 2702(a)(4) requires use of an object "calculated or likely to produce death or serious injury." Hence, the offense requires proof of "violent force" "capable of causing physical pain or injury," required by *Johnson*, 559 U.S. at 140 (emphasis omitted). . . . As a result, aggravated assault under 18 PA. CONS. STAT. § 2702(a)(4) qualifies as a crime of violence under § 4B1.2(a)(1), and the District Court was correct in so finding.

*Id.* Stated differently, the Court found that because Pennsylvania's aggravated assault statute had as an element the infliction of bodily injury, and because bodily injury, as defined by the statute, necessarily involved the use of physical force, § 2702(a)(4) qualified as a crime of violence for the purposes of the Guidelines.

Here, N.J.S.A. § 2C:12-1(b)(2), the subsection of New Jersey's aggravated assault statute that formed the basis of Defendant's conviction, is virtually identical to the aggravated assault statute at issue in *Gorny* and *Lewis*.[10] Significantly, a conviction for aggravated assault with a deadly weapon under § 2C:12-1(b)(2) requires a person to cause or attempt to cause "bodily injury" to another person using a deadly weapon. And, as several courts – including the Third Circuit in *Gorny* and *Lewis* – have found, causing "bodily injury" necessarily requires the use of physical force. *See Castleman*, 134 S. Ct. at 1414 ("[T]he knowing or intentional causation of bodily injury necessarily involves the use of physical force."); *Lewis*, 2018 WL 317776 at *4

---

[10] Indeed, the only difference between the Pennsylvania statute and the statute at issue in this case is that the Pennsylvania statute states that a person commits aggravated assault if "he . . . attempts to cause or *intentionally* or knowingly causes bodily injury to another with a deadly weapon," 18 PA. C.S. § 2702(a)(4) (emphasis added), while N.J.S.A. § 2C:12-1(b)(2) provides that a person commits aggravated assault if he "[a]ttempts to cause or *purposely* or knowingly causes bodily injury to another with a deadly weapon," N.J.S.A. § 2C:12-1(b)(2) (emphasis added); *i.e.*, the only difference between the two statutes is the substitution of the word "intentionally" in the former with the word "purposely" in the latter. However, that minor difference does not render *Gorny* and *Lewis* distinguishable, because "intentionally" and "purposely" are synonyms, used interchangeable to refer to the same state of mind. *See, e.g.*, MODEL PENAL CODE §1.13(12) ("'[I]ntentionally' or 'with intent' means purposely."). Accordingly, the Court finds *Gorny* and *Lewis* persuasive.

(finding that causing "bodily injury," as defined under Pennsylvania's aggravated assault statute, "necessarily involve[d] . . . physical force within the meaning of § 4B1.2(a)(1)."); *Gorny*, 655 F. App'x at 925 (same); *United States v. Horton*, 461 F. App'x 179, 184 (3d Cir. 2012) (finding that N.J.S.A. § 2C:12-1(b)(7) was a crime of violence under the Elements Clause, because it required the violator to use force sufficient to cause bodily injury); *United States v. Anderson*, No. 15-578, 2016 WL 6595909, at *3 (finding that N.J.S.A. § 2C: 15-1(a)(2) constituted a crime of violence under the Elements Clause, because it included as an element the infliction of "bodily injury" on the person of another, and bodily injury is indistinguishable from physical force); *Bailey*, 2017 WL 2720281 at *3 (W.D. Pa. June 23, 2017) (finding that 18 PA. C.S. § 2702(a)(4) was a crime of violence under the Elements Clause, because it required the infliction of bodily injury, which necessarily involved the use of physical force). Indeed, as one court within this District has aptly observed, the statutory definition of "bodily injury" – as "physical pain, illness or any impairment of physical condition," N.J.S.A. § 2C:11-1(a) – is "consistent with the federal definition of 'physical force,' which requires 'force capable of causing physical pain or injury to another person.'" *Anderson*, 2016 WL 6595909 at *3 (quoting *Johnson*, 559 U.S. at 140).[11]  In short, the relevant case law makes clear that causing "bodily injury," as that term is defined

---

[11] During the sentencing hearing, Defendant argued that the robbery statute implicated in *Anderson* is indicative of an intent on the part of New Jersey's legislature to distinguish "bodily injury" from physical force. The subsection of New Jersey's robbery statute identified by Defendant states, in relevant part, that a person commits robbery "if, in the course of committing a theft, he . . . [i]nflicts bodily injury *or* uses force upon another." N.J.S.A. § 2C:15-1(a)(1) (emphasis added). Specifically, Defendant argued that the legislature's decision to phrase "bodily injury" and "force" in the disjunctive demonstrates that bodily injury can be committed without using physical force. Nonetheless, the Court declines to infer such an intent from a statute wholly disconnected to the aggravated assault statute at issue in this case, which cross-references the definition of "bodily injury" contained in N.J.S.A. § 2C:11-1(a). Furthermore, the Court notes that the *Anderson* court's analysis centered around a different subsection of the robbery statute, N.J.S.A. § 2C:15-1(a)(2), and thus, the court did not reach Defendant's argument in that case.

under N.J.S.A. §§ 2C:12-1(b)(2) and § 2C:11-1(a), necessarily requires the use of physical force within the meaning of U.S.S.G. § 4B1.2(a)(1).  Accordingly, because N.J.S.A. § 2C:12-1(b)(2) "has as an element the use, attempted use, or threatened use of physical force against the person of another," Defendant's aggravated assault conviction qualifies as a crime of violence for the purposes of the career offender enhancement.

Defendant's arguments that N.J.S.A. § 2C:12-1(b)(2) is not a crime of violence, because the "bodily injury" and "deadly weapon" elements of § 2C:12-1(b)(2) are broader than the federal generic version of aggravated assault, are without merit.  At the outset, Defendant's focus on the specific elements of the crime is directed towards the Enumerated Offense Clause, rather than the Elements Clause.  For example, while Defendant relies on *United States v. Martinez-Flores*, 720 F.3d 293 (5th Cir. 2013) for the proposition that bodily injury under New Jersey's aggravated assault statute is broader than the federal generic version of aggravated assault, which Defendant argues requires "serious bodily injury," *Martinez-Flores* is inapposite, because the analysis conducted in that case fell within the Enumerated Offense Clause.  *See Martinez-Flores*, 720 F.3d at 300 ("Thus, Martinez–Flores's third degree aggravated assault conviction does not constitute an *enumerated offense*.") (emphasis added).  Indeed, in *Martinez-Flores*, the Fifth Circuit explained that while an offense can also qualify as a crime of violence under the Elements Clause, the government did not assert an Elements Clause argument in that case.  *Id.* at 300 n. 9.  And, in any event, the Fifth Circuit noted that although the Third Circuit had previously held "that the New Jersey statute's requirement of the use of force sufficient to cause physical pain or injury constitutes having the use of force as an element," *id.* (citing *Horton*, 461 F. App'x at 184), the court was precluded from rendering a similar finding, because "the Third Circuit's holding conflict[ed] with [Fifth Circuit] precedent rejecting the proposition that a

defendant's causing bodily injury means that the statute has as an element the use of force." *Id.* Conversely, here, the Court is not so bound; rather, the Third Circuit's rulings in *Gorny* and *Lewis* serve as persuasive guidance that causing bodily injury, as that term is defined under N.J.S.A. § 2C:12-1(b)(2), necessarily requires the use of physical force. Thus, Defendant's reliance on *Martinez-Flores* is misplaced.

Similarly, the Court rejects Defendant's argument that the "deadly weapon" element of N.J.S.A. § 2C:12-1(b)(2) is broader than the generic version of aggravated assault, because one can use a deadly weapon,[12] as that term is defined under New Jersey law, without employing physical force. Significantly, the same argument was rejected in *Lewis*, where the Third Circuit found that the definition of "deadly weapon" under 18 PA. C.S. § 2702(a)(4), which mirrors the definition of "deadly weapon" under New Jersey's aggravated assault statute,[13] supported the court's determination that the statute required physical force within the meaning of the Elements Clause. *See Lewis*, 2018 WL 317776 at *4 ("Moreover, the force under § 2702(a)(4) necessarily includes physical force within the meaning of § 4B1.2(a)(1) because § 2702(a)(4) requires use of an object 'calculated or likely to produce death or serious injury.'").[14] Similarly, here, the Court

---

[12] Under New Jersey law, a "deadly weapon" is defined as "any firearm or other weapon, device, instrument, material or substance, whether animate or inanimate, which in the manner it is used or is intended to be used, is known to be capable of producing death or serious bodily injury or which in the manner it is fashioned would lead the victim reasonably to believe it to be capable of producing death or serious bodily injury." N.J.S.A. 2C:11-1(c).

[13] *Compare* 8 PA. STAT. AND CONS. STAT. ANN. § 2301 (defining a "deadly weapon," in relevant part, as "[a]ny firearm . . . or . . . other device or instrumentality which, in the manner in which it is used or intended to be used, is calculated or likely to produce death or serious bodily injury."), *with* N.J.S.A. 2C:11-1(c) (defining a "deadly weapon," in relevant part, as "any firearm or other weapon, device, instrument, material or substance . . . which . . . is known to be capable of producing death or serious bodily injury . . . .").

[14] Moreover, even accepting Defendant's argument as true, the Elements Clause merely requires that the state offense have "as an element the use, attempted use, or threatened use of physical force against the person of another," and the Court has already found that the "bodily injury" element of N.J.S.A. § 2C:12-1(b)(2) – as opposed to the deadly weapon element – requires the

finds that New Jersey's definition of deadly weapon further demonstrates that N.J.S.A. § 2C:12-1(b)(2) necessarily includes as an element the use of physical force.

Finally, Defendant argues that N.J.S.A. § 2C:12-1(b)(2) is not a crime of violence, because it is possible to employ a deadly weapon to cause bodily injury without using physical force. In so arguing, Defendant posits a hypothetical involving placing beer cans and golf clubs in front of the locker room shower stall of an unsuspecting victim, who would trip over those items upon exiting the stall. However, similar arguments regarding the indirect use of force have been rejected by both the Supreme Court and the Third Circuit. *See Castleman*, 134 S. Ct. at 1415 (finding that it "is impossible to cause bodily injury without applying force[;] . . . [t]hat the harm occurs indirectly, rather than directly (as with a kick or punch), does not matter."); *Chapman*, 866 F.3d at 132 (rejecting the defendant's argument that the statute at issue did not constitute a crime of violence, because it could be committed using indirect force, finding that "the use of physical force does not require that the person employing force directly apply harm to—*i.e.*, strike—the victim."). Accordingly, the Court finds that Defendant's hypothetical regarding the indirect use of force fails to demonstrate that a person can inflict bodily injury, as that term is defined for the purposes of New Jersey's aggravated assault statute, without using physical force.

The Court also finds that N.J.S.A. § 2C:12-1(b)(2) satisfies U.S.S.G. § 4B1.2(a)(1)'s scienter requirement. To that end, for an offense to constitute a crime of violence under the Elements Clause, the Third Circuit requires that the use of physical force be knowing or intentional, as opposed to reckless or negligent. *Otero*, 502 F.3d at 335; *Lewis*, 2018 WL

---

use of physical force. Stated differently, the Elements Clause does not require that every element of the state offense implicate a use of force.

317776 at *2. Here, N.J.S.A. § 2C:12-1(b)(2) contains an explicit requirement that a person "purposely or knowingly" cause bodily injury to another, thereby satisfying the Elements Clause's scienter requirement. *Id.* at *4.

In sum, the Court finds that because a person must purposely or knowingly inflict bodily injury on the person of another to commit aggravated assault under N.J.S.A. § 2C:12-1(b)(2), and because causing bodily injury thereunder necessarily involves the use of physical force, Defendant's conviction for aggravated assault with a deadly weapon qualifies as a crime of violence under § 4B1.2(a)(1) of the Guidelines. Accordingly, because Defendant has two prior qualifying convictions, the Court applies the career offender sentencing enhancement under U.S.S.G. § 4B1.1(a).

### B.      "Organizer or Leader" Sentencing Enhancement

The parties next dispute whether Defendant should receive a sentencing enhancement under U.S.S.G. § 3B1.1(a), which provides for a four-level sentencing enhancement if "the defendant was an organizer or leader of a criminal activity that involved five or more participants[15] or was otherwise extensive."[16] U.S.S.G. § 3B1.1(a). Specifically, the Government argues that a four-level enhancement is appropriate, because Defendant was an "organizer or leader" of the Trenton-based drug-trafficking enterprise at issue in this case, which involved five or more participants. In opposition, Defendant argues that the Court should apply a two-level

---

[15] "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, cmt. 2.

[16] "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1, cmt. 3.

enhancement under U.S.S.G. § 3B1.1(c),[17] rather than the four-level enhancement mandated by U.S.S.G. § 3B1.1(a), because: (1) Defendant was merely a supervisor in the criminal enterprise, as opposed to an organizer or leader; and (2) Defendant only supervised two participants in the criminal activity.[18]

Before analyzing whether a sentencing enhancement under U.S.S.G. § 3B1.1 is appropriate, the Court will briefly recount the facts underlying the drug-trafficking activity at issue in this case. From approximately June 2014 to December 2016, law enforcement conducted an investigation of a violent heroin trafficking operation (the "Conspiracy") conducted primarily out of the 100-200 blocks of Spring and Passaic Streets in Trenton, New Jersey. PSR ¶ 25. Law enforcement's investigation included, *inter alia*, the use of court-authorized wiretaps, numerous controlled substance purchases of heroin from co-conspirators, consensually recorded telephone calls and text messages, physical surveillance, and information provided by confidential informants. *Id.* at ¶ 36. In addition to Defendant, the Conspiracy included the following participants: (1) Keith Hunter,[19] an associate of Defendant's, who was charged with obtaining supplies of heroin and distributing the same to other members of the Conspiracy for re-distribution; (2) Jose Joaquin Torrez-Mezquina and his associate, Ileana Sanchez, the principal suppliers of heroin for the Conspiracy; (3) Bernadino Guervil,[20] an

---

[17] U.S.S.G. § 3B1.1(c) provides that, "if the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b)," the sentencing court should increase the offense by two levels. U.S.S.G. § 3B1.1(c).

[18] Defendant does not argue that the criminal activity involved less than five participants, and thus, has waived that argument for the purposes this opinion.

[19] On March 30, 2017, Hunter pled guilty to knowingly and intentionally conspiring and agreeing with others to distribute and possess with intent to distribute 100 grams or more of a mixture and substance containing a detectable amount of heroin, contrary to 21 U.S.C. § 846. PSR ¶ 4. Hunter was sentenced on July 7, 2017. *Id.* at ¶ 5.

[20] On April 28, 2017, Guervil pled guilty to knowingly and intentionally conspiring and agreeing with others to distribute and possess with intent to distribute a mixture and substance containing

associate in the Conspiracy, whom Defendant indicated was his "right-hand man"; (4) Defendant's younger brother, Elijah Abdullah ("Elijah"),[21] who was charged with distributing heroin in furtherance of the Conspiracy; (5) Christopher Proctor,[22] an associate of Defendant's, who was charged with distributing heroin in furtherance of the Conspiracy; (6) Prince Sarnoe,[23] an associate of Defendant's, who distributed heroin in furtherance of the Conspiracy; (7) Thomas Rogers,[24] an associate of Defendant's, who obtained heroin from the Conspiracy, and re-distributed the same throughout the Trenton area; and (8) Defendant's former girlfriend, India Daniels,[25] who, *inter alia*, communicated with Defendant, Hunter, and Torrez-Mezquina in furtherance of the Conspiracy's drug-trafficking operation. *See* PSR ¶¶ 2-35.

From August 2016 through December 2016, law enforcement intercepted telephone calls and text message communications that revealed the operations and underlying structure of the Conspiracy. *Id.* at ¶ 47. Significantly, the intercepted communications demonstrated that

---

a detectable amount of heroin, contrary to 21 U.S.C. § 846. PSR ¶ 8. Guervil was sentenced on July 18, 2017. *Id.* at ¶ 9.

[21] On April 6, 2017, Elijah pled guilty to knowingly and intentionally conspiring and agreeing with others to distribute and possess with intent to distribute 100 grams or more of a mixture and substance containing a detectable amount of heroin, contrary to 21 U.S.C. § 846. PSR ¶ 6. Elijah was sentenced on July 18, 2017. *Id.* at ¶ 7.

[22] On June 19, 2017, Proctor pled guilty to knowingly and intentionally conspiring and agreeing with others to distribute and possess with intent to distribute 100 grams or more of a mixture and substance containing a detectable amount of heroin, contrary to 21 U.S.C. § 846, as well as to being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). PSR ¶¶ 10-11. Proctor was sentenced on September 26, 2017. *Id.* at ¶ 12.

[23] On September 8, 2017, Sarnoe pled guilty to being a felon in possession of a firearm, contrary to 18 U.S.C. § 922(g)(1). PSR ¶ 19. Sarnoe was sentenced on January 10, 2018.

[24] On March 29, 2017, Rogers pled guilty to knowingly and intentionally conspiring and agreeing with others to distribute and possess with intent to distribute 100 grams or more of a mixture and substance containing a detectable amount of heroin, contrary to 21 U.S.C. § 846. PSR ¶ 2. Rogers was sentenced on August 24, 2017. *Id.* at ¶ 3.

[25] On September 8, 2017, Daniels pled guilty to knowingly and intentionally conspiring and agreeing with others to distribute and possess with intent to distribute a mixture and substance containing a detectable amount of heroin, contrary to 21 U.S.C. § 846. PSR ¶ 17. Daniels was sentenced on January 5, 2018.

Defendant was responsible for coordinating and obtaining supplies of heroin from, among other sources, Torrez-Mezquina and Sanchez. *Id.* at ¶ 48. Defendant would then provide the heroin to other members of the Conspiracy, including Hunter, Guervil, Sarnoe, and Elijah, who, in turn, would re-distribute the heroin to the public or other members of the Conspiracy, including Rogers and Proctor. *Id.* In arguing that Defendant was an "organizer or leader" in the Conspiracy, the Government relies, *inter alia*, on the following incidents:

- A September 22, 2016 text message from Defendant to Guervil, in which Defendant directed Guervil as to the quantity of heroin he should obtain from Sanchez. PSR ¶ 65.

- A November 4, 2016 telephone call between Defendant and Torrez-Mezquina, wherein Defendant indicated that Guervil was Defendant's "right-hand man." *Id.* at ¶¶ 69-70.

- Conversations between Defendant and Guervil, wherein Defendant directed Guervil not to "front" narcotics to buyers. *Id.* at ¶ 73.

- Intercepted text messages between Defendant and Guervil, in which Guervil indicated that he was willing to contribute to the substantial debt that Defendant had accumulated with Torrez-Mezquina. *Id.* at ¶¶ 63, 74-76.

- A September 13, 2016 text message from Defendant to Torrez-Mezquina, after Hunter's arrest for possession of heroin, wherein Defendant informed Torrez-Mezquina that "[m]y boy got locked up . . . ." *Id.* at ¶ 53.

- A series of text messages exchanged between Defendant and Elijah on October 18, 2016, wherein Defendant directed Elijah to pick up a supply of heroin from Sanchez on Defendant's behalf. *Id.* at ¶¶ 79-80. Elijah did in fact obtain heroin from Sanchez at Defendant's direction. *Id.*

- Multiple three-way telephone conversations between Defendant, Daniels, and Hunter, – which occurred in November 2016, while Defendant was detained at the Mercer County Jail on unrelated charges – during which Defendant directed Daniels to go to Defendant's residence to locate the contact information of Torrez-Mezquina, so Daniels could coordinate the procurement of heroin from Torrez-Mezquina while Defendant was in jail. *Id.* at ¶¶ 95-96.

- A subsequent four-way call between Defendant, Daniels, Torrez-Mezquina, and Hunter, wherein Defendant and Torrez-Mezquina agreed that Daniels would pick up a supply of heroin from Torrez-Mezquina. *Id.* at ¶ 97. After Torrez-Mezquina hung up, Defendant directed Daniels to distribute the heroin to Hunter once she received it, and explained that Hunter would give Daniels the proceeds from the sales, and that Daniels would pay

Torrez-Mezquina out of the funds supplied by Hunter. *Id.* Subsequent communications revealed that Daniels did indeed procure heroin from Torrez-Mezquina at Defendant's direction. *Id.* at ¶¶ 98-100.

- Communications between Defendant and Hunter on October 23, 2016, wherein Defendant directed Hunter to obtain a firearm for Defendant. *Id.* at ¶¶ 109-112.

"Whether a defendant satisfies an aggravating factor under § 3B1.1 is a question of fact, on which the government bears the burden of proof by a preponderance of the evidence." *United States v. Santiago*, 331 F. App'x 181, 182 (3d Cir. 2009). The commentary to U.S.S.G. § 3B1.1 provides the following factors for a sentencing court to consider in determining whether a defendant is an "organizer or leader" of criminal activity:

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

U.S.S.G. § 3B1.1, cmt. 4. Here, Defendant argues that these factors counsel against a four-level enhancement; specifically, Defendant argues that: (i) he had no decision-making authority over Guervil, Proctor, Hunter, Sarnoe, and Rogers, who each "bought and sold drugs from and to whomever they wanted and did not answer to [Defendant]," Def.'s Br. at 13; (ii) he did not recruit any of the other participants (although he admits to influencing his younger brother and girlfriend to assist him); (iii) he did not claim a right to a larger share in profits; and (iv) that Torrez-Mezquina and Sanchez were the true leaders of the criminal activity, as they decided the quantity of drugs to be sold, how much to charge, to whom to sell, and where to sell.

The record belies Defendant's contentions. Defendant clearly exercised decision-making authority – *e.g.*, Defendant was the person who coordinated the procurement of heroin from

Torrez-Mezquina and Sanchez, and he instructed Guervil, his "right hand man," on how to construct sales (*i.e.*, not to "front" narcotics), as well as on the quantity of heroin to obtain from Sanchez. The record also establishes that Defendant recruited Daniels and Elijah to act on behalf of the Conspiracy, and that Daniels and Elijah took orders from Defendant regarding the sale of heroin. Indeed, Defendant's participation in the planning and organizing of the Conspiracy's operations was far from minor; Defendant assumed a central role in the Conspiracy, coordinating the Conspiracy's procurement of heroin from multiple sources, and directing the redistribution of that heroin to other members of the Conspiracy. For example, while incarcerated, Defendant engaged in a four-way telephone call with Daniels, Torrez-Mezquina, and Hunter, during which Defendant put into motion a series of transactions, wherein: (i) Daniels would obtain heroin from Torrez-Mezquina on behalf of the Conspiracy; (ii) Daniels would distribute the heroin to Hunter; (iii) Hunter would redistribute the heroin and give the proceeds back to Daniels; and (iv) Daniels would provide a certain portion of those proceeds back to Torrez-Mezquina, retaining Defendant's profits. Moreover, Defendant's contentions regarding Torrez-Mezquina and Sanchez being the leaders of the Conspiracy are inapposite; the commentary itself states that "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1, cmt. 4. Accordingly, the factors listed in U.S.S.G. § 3B1.1 support a four-level enhancement.

Additionally, Defendant's argument that the Court should not apply a four-level enhancement, based on the fact that Defendant did not supervise five or more participants in the Conspiracy, is unpersuasive. Significantly, although the Court must find that there were at least five participants in the criminal activity to apply an enhancement under U.S.S.G. § 3B1.1(a), the Third Circuit has held that the defendant need only *supervise* one or more of those participants to

be an "organizer or leader." *See United States v. Tran*, 593 F. App'x 153, 156 n. 4 (3d Cir. 2014) ("Supervision of one person is sufficient to trigger § 3B1.1."); *United States v. Katora*, 981 F.2d 1398, 1402 (3d Cir. 1992) ("To apply section 3B1.1, a district court must find that the defendant exercised control over at least one other person."). In *Tran*, for example, the Third Circuit found that the court below properly applied a four-level enhancement to the defendant's sentence under U.S.S.G. § 3B1.1(a), despite the fact that the defendant only supervised one of the participants – his "right-hand man" – in the criminal activity. 593 F. App'x at 155-56. Here, by Defendant's own admission, he had a supervisory "role with respect to his girlfriend Daniels and younger brother Elijah, often directing them regarding the heroin." Def.'s Br. at 12. Thus, even assuming that Defendant did not exercise supervision over the other participants in the Conspiracy, Defendant's supervision of Elijah and Daniels is sufficient to trigger the sentencing enhancement under U.S.S.G. § 3B1.1(a). Accordingly, because the Government has met its burden of demonstrating, by a preponderance of the evidence, that Defendant was an "organizer or leader" in the Conspiracy, the Court finds that a four-level sentencing enhancement under U.S.S.G. § 3B1.1(a) is warranted.

IV.     **CONCLUSION**

For the foregoing reasons, the Court finds that Defendant qualifies as a career offender under U.S.S.G. § 4B1.1(a), as well as an "organizer or leader" of criminal activity under U.S.S.G. § 3B1.1(a), and thus, that sentencing enhancements under both of those sections of the Guidelines are appropriate.


Dated:  January 17, 2018                          /s/ Freda L. Wolfson
                                                  Hon. Freda L. Wolfson
                                                  United States District Judge